## AFFIDAVIT

I, Daniel Merchand, being sworn, depose and state as follows:

1. I am a Detective Corporal with the Burlington Police Department currently assigned to the Drug Enforcement Administration (DEA) as a Task Force Officer (TFO). In connection with my duties and responsibilities, I have received extensive training, both formal and informal, in the field of narcotics investigation and enforcement. I have also participated in investigations relating specifically to the possession and distribution of heroin and cocaine base (also known as crack cocaine), the types of drugs that are being distributed by the person under investigation here. I have also participated in various aspects of investigatory work, including undercover surveillance and undercover narcotics purchases. I have participated in several narcotics-related arrests and the execution of many narcotics-related search warrants. I have written affidavits in support of search and arrest warrants and frequently utilized the services of informants and other confidential sources of information.

2. This affidavit is submitted to establish probable cause to believe that on July 15, 2016, Leander HANNIBAL violated 21 U.S.C. § 841(a)(1) by knowingly and intentionally possessing with intent to distribute heroin, a Schedule I controlled substance, and crack cocaine, a Schedule II controlled substance.

3. I am familiar with the facts and circumstances of the investigation based on my personal participation in this case, my discussion with other with other law enforcement agents, my discussions with witnesses involved in the investigation, and my review of records, recordings, and reports relating to the investigation.

4. Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included details of every aspect of my investigation nor have I included all the details of other investigations known to me.

### Events of June 23 and June 25, 2016

5. On June 23, 2016 Burlington Police Detective Corporal Dwayne Mellis and I met with two individuals at the Burlington Police Department who had been identified during a narcotics investigation as having facilitating narcotics sales in the Greater Burlington area. Both individuals wished to cooperate

1

with law enforcement in hopes of receiving consideration on any future prosecution. Detective Corporal Mellis registered both individuals as Burlington Police Confidential Informants; herein identified as CI1[1] and CI2.

6.  CI1 and CI2 advised they could purchase heroin and crack cocaine after contacting cellular telephone number (802) 503-4814; herein the TARGET TELEPHONE. CI1 and CI2 advised the voices that would answer TARGET TELEPPHONE differ at times. CI1 and CI2 further advised after placing a phone call to TARGET TELEPHONE they would then be directed to meet someone other than the person answering the TARGET TELEPHONE. CI1 and CI2 advised the person it would meet to consummate the purchase would be a "runner", or local resident acting on behalf of the person on the TARGET TELEPHONE.

7.  CI1 and CI2 advised they had talked with someone on the TARGET TELEPHONE as recently as the day prior to purchase and were directed to meet with a male CI1 and CI2 knew as "JOE MAYO". CI1 advised it had purchased heroin earlier this same day from "JOE MAYO" on North Winooski Avenue in the City of Burlington. It should be noted "JOE MAYO" is an alias of Randy MAYO who is known to me from prior police contact.

8.  CI1 and CI2 agreed they could purchase heroin on behalf of law enforcement on this same day. A plan was formulated to have a police officer acting in an undercover capacity to accompany and drive CI1 and CI2 to and from the purchase. At the direction of law enforcement CI1 placed a recorded call to TARGET TELEPHONE arranging to purchase a quantity of heroin. After completing the recorded call to TARGET TELEPHONE, CI1 received an incoming call from TARGET TELEPHONE shortly after directing CI1 to go to North Winooski Avenue.

9.  CI1, CI2, and their vehicle were searched by law enforcement and no drugs, contraband, or large amounts of currency were located. CI1 was also provided with sufficient funds of US currency to complete the anticipated transaction;

---

[1] CI1's criminal history includes convictions for false pretenses or false tokens, heroin-sale, reckless endangerment, retail theft, vehicle operation license suspended (multiple times), theft of rented property, violations of probation, disorderly conduct, burglary, and buy, receive, sell, possess, conceal stolen property, and conspiracy to distribute cocaine. This individual's criminal history is extensive, and there may be other convictions in addition to those listed here.

the serial numbers of the funds were recorded prior to being given to CI1. CI1 was outfitted with an electronic audio transmitter for the purpose of monitoring and recording the anticipated transaction. Surveillance was established in the area of the anticipated meet location. Detective Bellavance of the Burlington Police Department acting in an undercover capacity transported CI1 and CI2 to the area of the anticipated meet location.

10.   Prior to Det. Bellavance, CI1, and CI2 arriving at the meet location Detective Sergeant Couture observed MAYO in the area of the anticipated meet location. Detective Sergeant Couture observed MAYO walk down the driveway of 42 North Winooski Avenue. Upon the arrival of Detective Bellavance, CI1 and CI2 in the area of 42 North Winooski Avenue, CI1 exited the vehicle and made an outgoing phone call. This action was observed by Detective Sergeant Couture. The outgoing call made by the CI1 was later confirmed as a call to MAYO. CI1 was then observed walking down the same driveway MAYO had been observed going down. A short time later CI1 was observed coming back out of the driveway and CI1 got back into the vehicle with Detective Bellavance and CI2. This action was observed by Detective Sergeant Couture. Upon entering the vehicle, CI1 displayed two knotted baggies of tan powder that CI1 stated it had just purchased from MAYO. CI1 turned over the baggies it purchased to Detective Bellavance.

11.   Following the purchase Detective Bellavance transported CI1 and CI2 from the area and back to the police department. The person of CI1 was searched again and no drugs, contraband, or large amounts of currency were located. Detective Bellavance tested a random sample from one of the two baggies, using a NARK II field test kit and found that it tested presumptive positive as heroin.

12.   CI1 provided a statement following the purchase and advised when it arrived at the meet location it called MAYO. CI1 advised MAYO directed CI1 down the driveway and met MAYO by the porch area in the back of the building. CI1 advised it provided the serialized US currency it was provided for the transaction to MAYO and Mayo provided CI1 with the heroin it turned over to Detective Bellavance.

13.   On June 25, 2016 as part of this investigation DEA SA Mark Persson, DEA SA Tom Doud and I were conducting surveillance in and around the area of Oakledge Park in Burlington, VT. A male was observed during surveillance in the park. I was conducting

video surveillance of the male in the park as SA Persson called the TARGET TELEPHONE. The male being videotaped by me answered a cellular telephone. Following the phone call the male left the area in a vehicle and Burlington Police conducted a motor vehicle stop of vehicle. During the stop the male presented a New York State photo identification with the name Leander HANNIBAL.

14. Following the June 25 traffic stop Detective Mellis and I met with CI1 and directed CI1 to place a recorded TELEPHONE call to TARGET TELEPHONE to inquire about a purchase. The first call was unanswered and a second recorded call was placed to the TARGET TELEPHONE. When CI1 placed the calls to TARGET TELEPHONE SA Persson again had HANNIBAL under observation. The first call went unanswered. On the second phone call SA Persson observed HANNIBAL reach into his right pocket. SA Persson then observed HANNIBAL appear to pull an object out of his pocket. SA Persson then observed HANNIBAL position his head and shoulder as if he had placed a phone there.

**Events of July 15, 2016**

15. During the evening of July 15, 2016 Det. Mellis and I met with CI1 and CI1 advised that the current holder of the TARGET TELEPHONE currently had heroin and crack cocaine available for purchase. CI1 suspected that it would be directed to a different "runner" than MAYO after contacting the TARGET TELEPHONE. CI1 anticipated it would have to travel to the area of the Rite Aid on North Avenue by Ethan Allen Parkway. Based on the location provided by CI1 for the anticipated meeting, surveillance was established to monitor a residence on Ethan Allen Parkway, a resident of which had previously provided information to law enforcement about previously purchasing and dealing on behalf of a holder of the TARGET TELEPHONE; this subject will herein be referred to as SOURCE OF INFORMATION or SOI.[2]

---

[2] SOI's criminal history includes convictions for petty larceny (twice), retail theft, escape, lewd-lascivious conduct, unlawful restraint in second degree, sexual assault, violations of probation, violation of conditions of release, possession of drug paraphernalia, loitering, false police report, grand larceny, burglary, use/under influence of controlled substance, possession of controlled substance paraphernalia, and operating a motor vehicle under the influence. This individual's criminal history is extensive and there may convictions in addition to those listed above. In addition, SOI is providing information in

16. A plan was formulated to utilize CI1 to conduct a controlled purchase of heroin and crack cocaine by calling the TARGET TELEPHONE. CI1 and its vehicle were searched and no drugs, contraband, or large amounts of currency were located. CI1 was also provided with sufficient funds of US currency to complete the anticipated transaction; the serial numbers of the funds were recorded prior to being given to CI1. CI1 was outfitted with an electronic audio transmitter for the purpose of monitoring and recording the anticipated transaction. Surveillance was established in the area of the anticipated meet location and of SOI's residence. TFO Robert Estes acting in an undercover capacity was going to transport CI1 to and from the meet.

17. CI1 placed two recorded telephone calls to the TARGET TELEPHONE and arranged to purchase a known amount of heroin and crack cocaine. CI1 was directed by the male answering the TARGET TELEPHONE to an area on North Avenue for the purchase. Following the telephone call where CI1 received the meet location from TARGET TELPEHONE SA Chetwynd observed SOI exit its residence and surveillance units observed SOI travel to the arranged meet location between CI1 and TARGET TELEPHONE. It should be noted CI1 did not know if the male answering the TARGET TELEPHONE was the same individual CI1 had previously spoken with in June.

18. TFO Estes transported CI1 to the meet location and TFO Estes and surveillance units observed CI1 get out of the vehicle with TFO Estes and enter SOI's vehicle. After a brief meeting CI1 got out of SOI's vehicle and got back into the vehicle with TFO Estes. When CI1 entered the vehicle with TFO Estes CI1 turned over knotted baggies of suspect crack cocaine and heroin it had received from SOI. TFO Estes transported CI1 from the area and surveillance units observed SOI leave the meet location and return to its residence.

19. Following the purchase TFO Estes transported CI1 to meet with Detective Mellis and me. The person of CI1 was searched again and no drugs, contraband, or large amounts of currency were located. CI1 advised it gave the serialized currency to SOI and obtained the drugs it turned over to TFO Estes from SOI. Detective Mellis tested a random sample from one of the baggies of suspect crack cocaine and one of the baggies from the suspect heroin CI1 had purchased. The suspect crack cocaine tested

---

the hope of receiving future consideration in connection with possible prosecution in this investigation.

positive for the presence of cocaine and the suspect heroin tested positive for the presence of heroin.

20. Following the purchase SA Persson and I contacted SOI and met with SOI during the evening of July 15, 2016. SOI admitted that there was currently a male in its residence that had heroin and crack cocaine. SOI further advised it had been going out and making deliveries and running errands on behalf of the male. SOI advised one of the errands it had conducted on behalf of the male was to bring approximately 20 baggies of heroin and 20 baggies of crack cocaine to a male over on North Winooski Avenue. SOI advised it had also obtained a scale so the male at its residence could weigh the narcotics the male had in SOI's apartment. SOI advised the male was in possession of distribution quantities of heroin and crack cocaine that SOI had seen at its residence. I showed SOI a previous surveillance photograph taken of HANNIBAL during the surveillance in Oakledge Park. SOI advised HANNIBAL was the male currently in its residence. SOI was instructed by SA Persson and me to provide HANNIBAL with a reason to leave the residence.

21. On the evening of July 15, 2016 I observed a Green Cab parked in the driveway of where SOI resides. Following the cab leaving the residence SOI contacted me and advised HANNIBAL had just left the residence in a cab. SOI further advised HANNIBAL would not leave drugs with SOI or its paramour because of their addiction. SOI advised it suspected the drugs would be located in HANNIBAL's under garments as HANNIBAL had been going in and out of the bathroom while at its residence.

22. Late in the evening, Burlington Police conducted a traffic stop of the Green Cab on North Avenue in the area of Washington Street. There was a single driver of the cab and HANNIBAL was located in the rear passenger side seat in the cab. Members of DEA and Burlington Police approached the vehicle and ordered HANNIBAL from the vehicle and he was placed under arrest. SA Persson called the TARGET TELEPHONE and buzzing noise could be heard emitting from inside the rear compartment of the taxi in the rear pocket located on the back of the front passenger seat, right in front of where HANNIBAL had been seated. I asked the cab driver if he searched his taxi after passengers exit his taxi and he advised he did, and that the phone had not been there prior to picking up HANNIBAL. The driver further contacted his dispatcher and inquired what phone number had been provided for the pickup. The cab driver provided the number for the TARGET TELEPHONE as the number that had been used for the pickup

6

of HANNIBAL. A second call was placed to the TARGET TELEPHONE to confirm and he phone located in the taxi rang again.

23. A search of HANNIBAL's person revealed approximately $980 in US currency in his left front shorts pocket. A later check of the serial numbers of the money seized revealed the serialized currency utilized from the controlled purchase earlier in the evening conducted by CI1 from SOI, after having called the TARGET TELEPHONE.

24. HANNIBAL was transported back to the Burlington Police Department where other officers and I conducted a thorough search of HANNIBAL. HANNIBAL had a knotted plastic sandwich bag containing several individual knotted baggies of suspect crack cocaine and suspect heroin underneath his testicles. I recognized the packaging as consistent with the packaging purchased by CI1 earlier and in the manner consistent for distribution. DEA SA Brandon Hope tested a random sample from one of the baggies of suspect crack cocaine and one of the baggies from the suspect heroin from the bag located underneath HANNIBAL's testicles. The suspect crack cocaine tested positive for the presence of cocaine and the suspect heroin tested positive for the presence of heroin. In total the suspect heroin weighed approximately 17.7 grams and the suspect crack cocaine weighed 30.9 grams. I recognize these amounts and manner of packaging to be consistent with an intention to distribute and not an amount for personal use.

25. Based on the above-described circumstances, there is probable cause to conclude that on July 15, 2016, HANNIBAL possessed heroin and cocaine base with the intent to distribute those controlled substances.

Dated at Burlington, Vermont, this 17th day of July, 2016.

_____
DANIEL MERCHAND
DEA TFO

Sworn to and subscribed before me this 17th day of July, 2016.

_____
HON. CHRISTINA REISS
Chief Judge, United States District Court